# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No.  16-MD-2724<br>HON. CYNTHIA M. RUFE |
| IN RE: LIDOCAINE-PRILOCAINE CASES | |
| THIS DOCUMENT RELATES TO:<br><br>*ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | 16-LD-27243<br><br>Civil Case No. 17-cv-3819<br><br>**<u>JURY TRIAL DEMANDED</u>**<br>**<u>CLASS ACTION</u>** |

## INDIRECT RESELLER PLAINTIFFS'
## AMENDED CLASS ACTION COMPLAINT

**FILED WITH REDACTIONS – PUBLIC VERSION**

# TABLE OF CONTENTS

**PAGE**

I.     NATURE OF THE ACTION ............................................................................ 1

II.    ONGOING FEDERAL AND STATE INVESTIGATIONS ............................. 3

III.   THE ROLE OF INDEPENDENT PHARMACIES .......................................... 8

IV.    JURISDICTION AND VENUE .................................................................... 9

V.     PARTIES ...................................................................................................... 10

       A.    Plaintiffs ............................................................................................ 10

       B.    Defendants ........................................................................................ 12

       C.    Co-conspirators ................................................................................ 14

VI.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE .............. 14

VII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY .......................... 15

       A.    Generic drugs are commodity products that compete on price ........... 15

       B.    Pricing of generic drugs discourages unilateral price increases ......... 18

VIII.  THE GENERIC LIDOCAINE-PRILOCAINE CONSPIRACY ..................... 20

       A.    Defendants conspired to raise Lidocaine-Prilocaine prices. ............... 20

             1.    Defendants' dominance over Lidocaine-Prilocaine sales permitted them to
                   fix prices, and their abrupt price increases are otherwise inexplicable..... 20

             2.    Defendants' collective market dominance permitted them to collude...... 21

             3.    Defendants' effective prices were remarkably stable before skyrocketing
                   in the Class Period. ................................................................................ 21

             4.    There are no shortages or other market changes that would justify
                   Defendants' price increases. ................................................................... 24

       B.    Defendants orchestrated their conspiracy through in-person meetings and other
             forms of communication. ................................................................................ 25

       C.    Investor communications demonstrate an intent to fix and maintain
             supracompetitive prices to realize record profits. ............................................. 34

       D.    Industry commentary indicates collusion is a plausible explanation for the
             increase in Lidocaine-Prilocaine price ............................................................ 38

       E.    Defendants' concerted efforts to increase prices for generic Lidocaine-Prilocaine
             yielded supracompetitive profits ..................................................................... 40

       F.    Factors increasing the market's susceptibility to collusion ................................. 40

i

**FILED WITH REDACTIONS – PUBLIC VERSION**

     5.      Industry concentration ............................................................. 41

     6.      Barriers to entry ..................................................................... 41

     7.      Demand inelasticity ................................................................ 42

     8.      Lack of substitutes .................................................................. 43

     9.      Standardized product with high degree of interchangeability ................. 44

     10.     Inter-competitor contacts and communications ......................................... 45

IX.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ........... 51

     A.     The Statutes of Limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy ............................................. 51

     B.     Fraudulent concealment tolled the Statutes of Limitations ................................. 53

         1.      Active concealment of the conspiracy ..................................... 54

         2.      Plaintiffs exercised reasonable diligence ................................. 54

X.     CONTINUING VIOLATIONS ........................................................................ 55

XI.     DEFENDANTS' ANTITRUST VIOLATIONS.............................................. 55

XII.     CLASS ACTION ALLEGATIONS ............................................................. 57

XIII.     CAUSE OF ACTIONS ................................................................................. 61

XIV.     PRAYER FOR RELIEF ............................................................................. 107

XV.     JURY DEMAND ........................................................................................ 109

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.    <u>NATURE OF THE ACTION</u>

1.      This action brings claims on behalf of pharmacies ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic lidocaine and prilocaine ("Lidocaine-Prilocaine").[1]

2.      Lidocaine-Prilocaine is a combination of lidocaine and prilocaine and is commonly prescribed topical anesthetic used to numb skin to pain from injections and other medical procedures. This drug works by blocking nerves from transmitting painful impulses to the brain. Branded Lidocaine-Prilocaine cream has been on the market for over 20 years, and generic versions have been available since at least 2003.

3.      For years, competition among sellers of Lidocaine-Prilocaine kept prices stable, at low levels. But starting on or around ▮▮▮▮▮▮, Defendants, who dominate the market for Lidocaine-Prilocaine, abruptly and inexplicably raised prices. For example, over the course of twelve months during the Class Period, the average market price for a 30 gram tube of generic Lidocaine-Prilocaine increased ▮▮▮▮

4.      Defendants' unlawful and anticompetitive conduct in the Lidocaine-Prilocaine market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      The price increases imposed by Defendant manufacturers of generic Lidocaine-Prilocaine cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices

---

[1] As used herein, the term "Lidocaine-Prilocaine" includes generic Lidocaine-Prilocaine topical cream.

**FILED WITH REDACTIONS – PUBLIC VERSION**

of generic Lidocaine-Prilocaine were the result of an illegal agreement among Defendants to fix prices.

6.     As alleged below, Defendants arranged their conspiracy partly through in-person meetings at trade association events, which allowed them to actively conceal their agreements from paper or electronic records.

7.     Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of generic Lidocaine-Prilocaine —have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

8.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of Doxycycline Hyclate and Glyburide. But the DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

9.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of antitrust violations in the generic drug industry, confirms that there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[4]

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[4] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

10.     Manufacturers of generic Lidocaine-Prilocaine are implicated in these ongoing investigations. As discussed below, at least two of the three Defendants named here—Impax Laboratories, Inc. and Sandoz Inc.—have received a federal grand jury subpoena from the Connecticut AG as part of the generic drug price-fixing investigations.

11.     Plaintiffs have paid many millions of dollars more than they would have in a competitive market for generic Lidocaine-Prilocaine.

12.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that purchased generic Lidocaine-Prilocaine products manufactured by any Defendant, from April 1, 2014 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that purchased generic Lidocaine-Prilocaine products manufactured by any Defendant, from April 1, 2014 to the present.

## II.    ONGOING FEDERAL AND STATE INVESTIGATIONS

13.     On December 12 and 13, 2016, the DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[5]

---

[5] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

FILED WITH REDACTIONS – PUBLIC VERSION

14.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[6]   Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[7]   Glazer and Malek are cooperating with the DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[8]

15.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader. The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[9] Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[10]

16.     According to one report, prosecutors see the investigation of the generic drug industry much like the DOJ's antitrust probe of the auto parts industry, which has morphed into

---

[6] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[7] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[8] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[9] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[10] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

the DOJ's largest criminal antitrust probe ever. *See In re Automotive Parts Antitrust Litig.*, No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[11]

17.    The DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceutical, Inc. ("Heritage"); Impax Laboratories, Inc.; Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc.; Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

18.    The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  The DOJ does not empanel grand juries lightly. The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution." Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement

---

[11] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[12]

19.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of the DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[13]

20.     Another significant indication of criminal price-fixing in the generic drug industry is that the DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[14]  As explained on the DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[15]

---

[12] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[13] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[14] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[15] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download.

FILED WITH REDACTIONS – PUBLIC VERSION

21.    In addition to the federal criminal investigation, after years of investigation and on the basis of millions of documents as well as witness testimony, the Attorneys General of at least forty-seven States have filed a complaint in this MDL alleging an overarching conspiracy among generic drug manufacturers to fix prices and allocate customers. The States have made clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors"[16] and have stated in open court that complaints involving additional drugs and manufacturers will be filed in 2019.

22.    The publicly available version of the State AG Complaint is heavily redacted. Among the obscured portions are the contents of conspiratorial communications, which the Connecticut AG has described as "mind-boggling."[17]  The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors." This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[18]

23.    The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and

---

[16] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).

[17] Mark Pazniokus, "How a small-state AG's office plays in the big leagues," CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[18] State AG Amended Complaint ¶ 7.

FILED WITH REDACTIONS – PUBLIC VERSION

long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[19] Plaintiffs do not yet have access to all of the information available to the government enforcement agencies. What is known is that on the heels of meeting at industry events, Defendants raised Lidocaine-Prilocaine prices to previously unheard-of levels. It is clear that the large and unprecedented price increases for generic Lidocaine-Prilocaine cannot be explained by normal, competitive market forces. The explanation is collusion.

## III.    THE ROLE OF INDEPENDENT PHARMACIES

24.    There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

25.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies. Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

---

[19] State AG Amended Complaint ¶ 1.

FILED WITH REDACTIONS – PUBLIC VERSION

## IV.    JURISDICTION AND VENUE

26.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

27.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

28.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

29.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[20]

---

[20] DOJ, Antitrust Division Manual at III-83.

FILED WITH REDACTIONS – PUBLIC VERSION

30.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Lidocaine-Prilocaine throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.     <u>PARTIES</u>

### A.     **Plaintiffs**

31.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

32.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

FILED WITH REDACTIONS – PUBLIC VERSION

33.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

34.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

35.     ~~Plaintiff Southside Pharmacy, Inc. ("Southside") is a privately held independent pharmacy located in Jamestown, New York. Southside indirectly purchased and continues to purchase Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.~~

36.     ~~Plaintiff Dickson Apothecary is a privately held independent pharmacy in Dickson, Tennessee. Dickson Apothecary indirectly purchased and continues to purchase Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.~~

37.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase

FILED WITH REDACTIONS – PUBLIC VERSION

Defendants' generic Lidocaine-Prilocaine products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

### B.    Defendants

38.    Defendant Impax Laboratories, Inc. is a Delaware corporation with its principal place of business in Hayward, California. As noted above, Impax's generics division is called Global Pharmaceuticals (collectively referred to as "Impax") and is a manufacturer and/or distributor of Lidocaine-Prilocaine to customers in this District and in other locations in the United States.

39.    Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey. During the Class Period, Sandoz marketed and sold Lidocaine-Prilocaine to customers in this District and in other locations in the United States. Sandoz is a generics division of pharmaceutical giant Novartis AG.

40.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly owned subsidiary of Sandoz, which acquired it in July 2012 for $1.5 billion. [21] During the Class Period, Fougera marketed and sold generic Lidocaine-Prilocaine products to customers in this District and in other locations in the United States. Collectively, Sandoz and Fougera shall be referred to herein as "Sandoz".

41.    Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech") is a Delaware corporation with its principal place of business in Amityville, New York. On April 17, 2014, Akorn, Inc. announced

---

[21]http://www.es.sandoz.com/media_center/press_releases_news/global_news/sandoz_completes_acquisition_of_fougera_pharmaceuticals_positioning_sandoz_as_1_in_generic_dermatology_globally_.shtml.

**FILED WITH REDACTIONS – PUBLIC VERSION**

that it acquired Hi-Tech for $640 million.[22] During the Class Period, Hi-Tech manufactured and distributed generic Lidocaine-Prilocaine to customers in this District and in other locations in the United States.

42.     Defendant Akorn, Inc. is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. During the Class Period, Akorn manufactured and sold generic Lidocaine-Prilocaine to customers in this District and in other locations in the United States. Collectively, Akorn and Hi-Tech shall be referred to herein as "Akorn".

43.     Whenever reference is made in this Complaint to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

44.     All acts alleged in this complaint to have been done by Defendants were performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of Defendants' business affairs.

45.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

---

[22] Akorn, Akorn Completes Acquisition of Hi-Tech Pharmacal (Apr. 17, 2014), *available at* http://www.akorn.com/dynamic/news_158.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

### C.     Co-conspirators

46.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein. Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

### VI.     INTERSTATE AND INTRASTATE TRADE AND COMMERCE

47.     During the Class Period, Defendants sold and distributed generic Lidocaine-Prilocaine in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

48.     Defendants' and their co-conspirators' conduct, including the marketing and sale of generic Lidocaine-Prilocaine, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

49.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive generic Lidocaine-Prilocaine to Plaintiffs inside each respective state and territory. The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## VII.   BACKGROUND OF THE GENERIC DRUG INDUSTRY

### A.   Generic drugs are commodity products that compete on price

50.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[23] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[24]

51.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[25] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[26]

52.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[27]  And that may be conservative. According to a Federal Trade Commission ("FTC") study, in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[28]

---

[23] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[24] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[25] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[26] *Id.*

[27] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

[28] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

Mature generic markets—like that of Lidocaine-Prilocaine—typically have several manufacturers that compete for sales, hence keeping prices in check.

53.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs. Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[29]

54.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers must clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

55.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

56.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are commodity products" and, as a consequence of that, are marketed "primarily on the basis of

---

[29] GPhA Report at 1.

FILED WITH REDACTIONS – PUBLIC VERSION

price."[30]  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

57.     It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales. When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives. Over time, the price of a generic drug approaches the manufacturers' marginal costs.  As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

**Generic Competition and Drug Prices**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

58.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share. A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a

---

[30] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[31]

59.     When there are multiple generic manufacturers in an established generic market—as with generic Lidocaine-Prilocaine—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

**B.     Pricing of generic drugs discourages unilateral price increases**

60.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

61.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to

---

[31] GAO Report at 23.

acquire prescription . . . drugs."[32]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies," in effect "a single national average."[33]  Thus, NADAC is one way to track general price trends in the marketplace.

62.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific.  Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts.  In order track manufacturer-specific pricing, this complaint uses QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[34]

63.     When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC.  Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

---

[32] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[33] *Id.*

[34]  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

64.     Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VIII.    THE GENERIC LIDOCAINE-PRILOCAINE CONSPIRACY

**A.    Defendants conspired to raise Lidocaine-Prilocaine prices.**

> **1.    Defendants' dominance over Lidocaine-Prilocaine sales permitted them to fix prices, and their abrupt price increases are otherwise inexplicable.**

65.     The market for Lidocaine-Prilocaine is mature, as generic versions have been on the market for years.  In ███████, Defendants' total revenue from sales of these products was approximately ████████.[35]  This compares to only ██████████, a year before the price fixing conspiracy.

---

[35] Revenue, unit sales, and effective prices are obtained from QuintilesIMS Inc. ("IMS Health"). IMS Health is the largest vendor of physician prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere.  "Effective prices" represent actual transaction prices, as reported by IMS Health.

FILED WITH REDACTIONS – PUBLIC VERSION

66.     A mature generic market, such as the market for Lidocaine-Prilocaine, has several generic competitors.  As noted above, because each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  In a market free from collusive activity, over time, generics' pricing would naturally near (and stay near) the generic manufacturers' marginal costs.

67.     At all times relevant for this lawsuit, there have been at least three manufacturers of Lidocaine-Prilocaine on the market.  Under accepted economic principles of competition, when there are multiple generics on the market, prices should remain at highly competitive, historic levels, and should not increase starkly as they did here absent anticompetitive conduct.  Drastic increases in Lidocaine-Prilocaine prices are themselves suggestive of Defendants' collective market dominance: if they did not already dominate the market, pricing excesses would be disciplined by losing market share to non-colluding competitors.

### 2.     Defendants' collective market dominance permitted them to collude.

68.     During the Class Period, the Defendants dominated the market with about a ███ share.  Likewise, before the Class Period, from ████████████████████, their sales made up about ████ of all United States direct purchases of Lidocaine-Prilocaine.

69.     In terms of revenue, in ████ Defendant Akorn's sales to direct purchasers was roughly ██████, Defendant Impax about ███████, Defendant Hi-Tech about ███████, and Defendant Sandoz about ███████.

### 3.     Defendants' effective prices were remarkably stable before skyrocketing in the Class Period.

70.     Before the Class Period, aside from a few brief aberrations, the effective prices of Defendants' Lidocaine-Prilocaine remained stable for years, as is typical in a mature market.  From

21

███████████████████████, *i.e.*, for almost three years leading up to the price fixing conspiracy, the standard deviation percentage of mean prices for Defendants was no more than ████.

71.     As illustrated below, Defendants' effective prices inexplicably increased sharply beginning in ██████████:



72.     **Sandoz:** For almost three years before the Class Period began, the average effective price per ███████████████████████.

73.     In █████████████ Sandoz's effective price was somewhat lower.  But ████████ ████ it began to increase its effective price,[36] █████████████████████████████

---

[36] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

**FILED WITH REDACTIONS – PUBLIC VERSION**

████████████████████████████████████████████████████████

██████████████████████████████████████████

74.     Even today, Sandoz's effective price remains unexpectedly high and would not have remained so high but for the price fixing conspiracy. ████████████████████████

████████████████████████████████████:

75.     **Impax**: ████████████████████████████████████████

████████████████████████████████

76.     ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

77.     **Akorn**: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

78.     **Hi-Tech**: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

79.     Defendants' price increases are reflected in the steep average price increases reported by the Centers for Medicare & Medicaid Services:

23



Source: NADAC Price Data

### 4.   There are no shortages or other market changes that would justify Defendants' price increases.

80.    During the Class Period, there was no significant increase in the costs of making Lidocaine-Prilocaine, no significant decrease in supply, and no significant increase in demand. Nonetheless, there were extraordinary increases by each of the Defendants in the prices they charged their customers for Lidocaine-Prilocaine. Such price increases in a commodity product for which there were no significant increases in costs or demand and no significant decrease in supply would not have been in each Defendant's unilateral self-interest absent the existence of a cartel.

FILED WITH REDACTIONS – PUBLIC VERSION

81.     Federal law requires that drug manufacturers report drug shortages.[37] Lidocaine-Prilocaine is not listed on the FDA's list of Current and Resolved Drug Shortages and Discontinuations Reported to FDA.  Lidocaine-Prilocaine also does not appear on any archived lists of the American Society of Health-System Pharmacists ("ASHP") Current Shortage Bulletins from July 3, 2012, through today, nor does it appear on the current list of ASHP Resolved Shortage Bulletins (which includes drug shortages dating back to August 2010).  None of the Defendants reported any drug shortages or supply disruptions to the FDA in explanation for the supracompetitive pricing of Lidocaine-Prilocaine.

82.     Nor does any change in marketplace explain the rising prices—before the Class Period, ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

**B.      Defendants orchestrated their conspiracy through in-person meetings and other forms of communication.**

83.     During the Class Period, Defendants conspired, combined, and contracted to fix, maintain, and stabilize prices, rig bids, and engage in market allocation concerning Lidocaine-Prilocaine, which had the intended and actual effect of causing Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Lidocaine-Prilocaine.

84.     Beginning in ████████████ Defendants collectively caused the price of Lidocaine-Prilocaine to increase dramatically.   Defendants' conduct cannot be explained by normal

---

[37] FDA Safety and Innovation Act of 2012, Pub. L. No. 112-144, §§ 1001-1008, 126 STAT. 995, 1099-1108.

FILED WITH REDACTIONS – PUBLIC VERSION

competitive forces.  It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Lidocaine-Prilocaine in the United States.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

85.    To sustain a conspiracy, conspirators often communicate to ensure that all are adhering to the collective scheme.  Here, such communications occurred primarily through (1) trade association meetings and conferences, (2) private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and (3) individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means.

86.    These secret, conspiratorial meetings, discussions, and communications helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid rigging, price-fixing, and market allocation scheme.

87.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competing generic drug companies.[38]  The State AGs have similarly noted the centrality of trade associations and industry conferences in their investigation stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their

---

[38] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

FILED WITH REDACTIONS – PUBLIC VERSION

competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[39]

88.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

89.  The GPhA (now called the Association for Accessible Medicines) is the "leading trade association for generic drug manufacturers."[40]  GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

90.  GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[41]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

91.  Defendants Impax and Sandoz were regular members of the GPhA during the Class Period.  Regular members "are corporations, partnerships or other legal entities whose primary

---

[39] CTAG Website, Press Release, *40 State Attorneys General Now Plaintiffs in Federal Generic Drug Antitrust Lawsuit* (Mar. 1, 2017), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[40] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.

[41] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

FILED WITH REDACTIONS – PUBLIC VERSION

United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[42]

92.     Several of Defendants high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period:

   a.   **2013 Board of Directors**: Carol Ben-Maimon, President, Impax Global Pharmaceuticals; and Don DeGolyer, President and CEO, Sandoz;

   b.   **2014 Board of Directors**: Carol Ben-Maimon, President, Impax Global Pharmaceuticals; Peter Goldschmidt, President of Sandoz US.

   c.   **2015 Board of Directors**: Marcy McDonald, VP Regulatory Affairs of Impax; Peter Goldschmidt, President of Sandoz US; and

   d.   **2016 Board of Directors**: Marcy McDonald, VP Regulatory Affairs of Impax; and Peter Goldschmidt, President of Sandoz US.

93.     In addition, former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic drugs, also served on GPhA's board of directors.

94.     The NACDS is a national trade association representing chain community pharmacies.  Its members include generic drug manufacturers, wholesalers, and retail chain pharmacies. NACDS holds regular industry events, including annual and regional conferences, which Defendants and other generic drug manufacturers attended, including the annual Total Store Expo.

---

[42] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

95. █████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ ██ ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

96. █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

97. █████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████.

98. █████████████████████████████████████

████████████████████████

99. █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

100.    For example, on August 10-13, 2013, NACDS held its 2013 Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. NACDS's August 2013 Total Store Expo was attended by the following representatives from all Defendants, who were key executives for generic drug sales and pricing:

---

█ ████████████████████████████████████████████████████

**FILED WITH REDACTIONS – PUBLIC VERSION**

a.   **Akorn:** M. Tranter, National Accounts Manager, Sales & Marketing; John Sabat, Senior VP, National Accounts;   Mick McCanna, Account Manager;

b.   **Hi-Tech**: Ed Berrios, VP Sales & Marketing; Michael Corley, VP, National Accounts; Thomas Kronovich, VP National Accounts;

c.   **Impax**: Chris Gerber, Director of Pricing and Contracts; Italo Pennella, Account Manager; Dan Rozmiarek, Account Manager;

d.   **Sandoz**: Peter Goldschmidt, President, Sandoz USA and Head, NA; Syeven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director, Key Customers; Armando Kellum, VP Sales & Marketing; Paul Krauthauser, SVP, Sales & Marketing; Della Lubke, National Account Executive.

101.   On October 28-30, 2013, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from all Defendants.

102.



103.

**FILED WITH REDACTIONS – PUBLIC VERSION**



104.    On June 3-4, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants, Hi-Tech, Impax, and Sandoz.

105.    On August 23-26, 2014, NACDS held its 2014 Total Store Expo at the Boston Convention Center in Boston, Massachusetts. NACDS's August 2014 Total Store Expo was attended by the following representatives from all Defendants, who were key executives for generic drug sales and pricing:

a.    **Akorn**: Ed Berrios, VP, Sales and Marketing - Hi-Tech Pharmacal Co., Inc.; Michael Corley, VP, National Accounts; Thomas Kronovich, VP, National Accounts; Bruce Kutinsky, Chief Operating Officer; Mick McCanna, Executive Director of National Accounts; Raj Rai Chief, Executive Officer; John Sabat, Senior Vice President of National Accounts; M. Tranter, National Accounts Manager, Sales & Marketing;

b.    **Impax:** Chris Gerber, Director of Pricing and Contracts; Italo Pennella, Account Manager; Dan Rozmiarek, Account Manager;

c.    **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales &

31

Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers.

106.    On October 27-29, 2014, GPhA held a meeting in Bethesda, Maryland that was attended by representatives from Defendants Impax and Sandoz.

107.    ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

108.    As uncovered in the State AGs' ongoing investigation, at these various conferences and trade shows, representatives from Defendants, as well as other generic drug manufacturers, discussed their respective businesses and customers.  These discussions would occur at social events, including lunches, cocktail parties, dinners, and golf outings, that usually accompanied these conferences and trade shows.  Defendants' employees used these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers.[44]

---

[44] *See, e.g.*, Amended Complaint (Public Version), *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056, ECF 168 (D. Conn.), at ¶¶ 50-52, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

109.    In conjunction with meetings at conferences and trade shows, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[45]

110.    A large number of generic drug manufacturers, including Defendants Impax and Sandoz are headquartered or have major offices in close proximity to one another in New Jersey and eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude. For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

111.    Generic drug manufacturer employees also get together regularly for what is referred to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.   During these GNOs, meetings and dinners, these employees meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

112.    Through these various interactions, Defendants' employees are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

---

[45] *Id.* at ¶¶ 53-60.

**FILED WITH REDACTIONS – PUBLIC VERSION**

113.    Defendants also routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (*e.g.*, a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

114.    Additionally, Defendants share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

### C.    Investor communications demonstrate an intent to fix and maintain supracompetitive prices to realize record profits.

115.    Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class Period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining them at supracompetitive levels.

116.    **Hi-Tech**:  During Hi-Tech's March 8, 2013 earnings call, Hi-Tech CEO David Seltzer stated:

> So we happen to have -- number one, we happen to be doing a significant amount of topicals than -- compared to several years back. So we have the Clobetasol items that we pretty much brought all in-house on the manufacturing side. We have our generic EMLA. We have licensed in a couple of Lidocaine products that are doing very well for us. So we have capacity. And it just happens to be that we were also able to purchase very recently a very high-speed filling and packaging line for creams and ointments that we needed. But that's also going to give us a tremendous amount of capacity going forward. So we are looking very hard to find additional products. We definitely see opportunity.

FILED WITH REDACTIONS – PUBLIC VERSION

117.    During Akorn's August 5, 2014 earnings call, Akorn CEO Raj Rai had the

following exchange with an analyst:

> Q (analyst): Raj, can you just go into a little bit more detail on the
> pricing increases on clobetasol. Are you seeing other opportunities
> across the portfolio, how much of an impact in terms of flow through
> from that increase are you going to see in the P&L and any pushback
> that you have heard around that, that would be helpful? Thank you.

> A (Raj Rai, CEO): Randall, this is sort of a new development and
> with the price increase came some additional contracts and we are
> in the process of implementing those contracts. So, I think the
> situation is still little bit fluid and we will have more to discuss in
> our next conference call when we have fully implemented these new
> contracts. But the opportunity as it stands is real and it's going to
> increase our sales substantially in the next quarter. I mean the
> process has already begun and as Tim mentioned that there are some
> costs associated with the price increases, so the third quarter would
> sort of be flat but I think we will start to see the benefit of the price
> increase and volumes coming through in the fourth quarter. And the
> question on other products, yes I think there is a general, we are
> seeing lot of price increases that are happening in the generic space
> and it affect some of our products as well. So, I would say overall,
> there is a healthier pricing environment than it was there, I would
> say six to eight months ago.

118.    On November 6, 2014, Akorn's CFO Timothy Dick stated:

> I mean, we mentioned when we discussed Clobetasol in our Q2
> conference call that historically for Hi-Tech, it would have been
> about $10 million product and there was – annually. And there was
> obviously some questions earlier in the Q&A that we're talking
> about sales that $100 million plus.

Mr. Dick also had this exchange with an analyst:

> Q (analyst): And as far as, the next time a competitor takes up price,
> do you anticipate that you would match in a much faster timeframe
> because of this experience, or is every situation different?

> A (Mr. Dick): I think every situation warrants a different strategy.
> So I think, yes, I mean, your assessment is correct.  I mean, we did
> – we took the price increase they took for a reason.

119.    During the same call, Mr. Rai stated:

> I think prices are stable. And as I said even in my prepared remarks,
> I think the market dynamics are pretty favorable to generics. And
> we haven't really seen anything that causes a heartburn or it made a
> cause of concern as far as pricing is concerned. So I would say, it's
> a healthy environment.

120.    On February 26, 2015, an analyst commented during an earnings call: "As we look at clobetasol contribution in 2015, maybe it's around 20% to 30% of operating profit."

121.    In its annual report for the period ended December 31, 2015, Akorn reported: "Our gross profit increased by $334.7 million, an increase of 128.0% over gross profit of $261.4 million in 2014.  Our overall gross profit margin was 60.5% in 2015 compared to 47.1% in 2014."  The company attributed the increased profit margin to the effects of "price changes."

122.    In or about May 2016, Akorn told industry analysts that "63% of [its] growth in 1Q16 versus 1Q15 was driven by price."

123.    During Akorn's August 4, 2016 earnings call, Akorn CFO Duane Portwood stated: "net revenue for the quarter ended June 30, 2016, was $281 million, an increase of $60 million or 27% over the prior-year quarter.  The increase in revenue was driven by organic growth, with approximately two-thirds attributable to price."

124.    Hi-Tech reported rising revenues in its United States generics business during the Class Period.

125.    **Impax:** On November 4, 2013, the then-President of Impax, Carole Ben-Maimon, acknowledged that Impax had increased the price of digoxin after Lannett had increased its price, after noting its medical necessity to patients.  In response to a question concerning Impax's "huge price increase on digoxin following Lannett's pricing action," Ben-Maimon stated: "The price

increase on dig[oxin] speaks for itself, but clearly, as a medically necessary drug, our focus there is really just to make sure that a high quality product is available to the customer." Ben-Maimon's comments make clear that Impax had no intention of competing for market share for digoxin by offering lower prices; it simply would ensure there was sufficient supply, at its newly increased pricing for its customers.

126.    Ben-Maimon demonstrated Impax's continued acceptance of Lannett's invitation to increase prices and noted Impax's commitment to maintaining price increases during a February 2014 earnings call with analysts.  Ben-Maimon stated regarding digoxin, "the market has been pretty stable with [Lannett] and us . . . [w]e're pretty comfortable that what we have done is rational and will result in ongoing profitability for that product."

127.    The Chief Executive Officer of Impax, Frederick Wilkinson, continued to echo Lannett's message on increasing prices in a third quarter earnings call on November 4, 2014:

> [L]et me address pricing.  We really don't talk much about pricing publicly, and whether we're going for competitive reasons but surprising to say we've done what most of the other generic competitors have done, we look at opportunities, we look at how competition shifts, we look at where there may be some market movement that will allow us to take advantages on price increases and we've implemented those and we'll continue to evaluate our line product-by-product probably a week and monthly basis to see if there are some opportunities to participate in that practice.

Wilkinson also acknowledged the federal investigation of pricing in the pharmaceutical industry during that earnings call.

128.    Impax reported rising revenues in its United States generics business during the Class Period.

129.    **Sandoz**:  On January 29, 2014, the Division Head of Sandoz Jeffrey George stated:

> So I think overall what I would say is that we've been quite pleased with the acquisition of Fougera. It is a business that has performed

37

> very well for us, with strong double-digit growth and very good margins given the limited competition nature of a lot of these markets.

130.   On April 23, 2015, Novartis CEO Joe Jiminez stated that Sandoz had "strong financial results" and "the U.S. was up 13% . . . driven by . . . our Fougera dermatology business."

131.   On July 21, 2015, Mr. Jiminez stated: "Sandoz delivered very strong financial results with sales and profit up double-digit; as you can see this is driven by the division increased focus on core markets particularly the U.S., which is up 23%."

132.   Sandoz reported rising revenues in its United States generics business during the Class Period.

**D.    Industry commentary indicates collusion is a plausible explanation for the increase in Lidocaine-Prilocaine price**

133.   Industry analysts agree that generic manufacturers' price hikes are consistent with a price fixing conspiracy.  For instance, Richard Evans at Sector & Sovereign Research wrote:

> A plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation.[46]

134.   According to one study, since 2013 approximately one in 19 generic drugs sold in the United States have undergone major price hikes that may be consistent with collusion:

> Fideres Partners LLP, a London-based consultancy that works with law firms to bring litigation against companies, reported "anomalous pricing patterns" in scores of generic drugs sold in the U.S. from 2013 to 2016.  It identified 90 medicines whose prices rose at least 250 percent over the three-year period and were increased by at least two drug companies around the same time, even

---

[46] *See* Ed Silverman, *Generic Drug Prices Keep Rising, but is a Slowdown Coming?*, WALL STREET JOURNAL (Apr. 22, 2015), *available at* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-a-slowdown-coming/.

**FILED WITH REDACTIONS – PUBLIC VERSION**

though there was no obvious market reason for the increases.  The average price jump among the 90 drugs was 1,350 percent, Fideres found.

"I don't think the public or even the politicians in the U.S. have any idea just how widespread and extreme the phenomenon is," said Alberto Thomas, one of Fideres's founders.[47]

135.      Another study concluded that in 2014, "292 generic medication listings went up by 10% or more, 109 at least doubled in price and 14 went up by ten or more times in price that year."[48]  A United States Government Accountability Office ("GAO") report also noted similar "extraordinary price increases" across many generic drugs in recent years that could not be linked to any particular cause.[49]

136.      Pennsylvania physicians through the Pennsylvania Medical Society called on state and federal governments to investigate surging generic prices, believing anticompetitive conduct was to blame:

According to Robert Campbell MD, chair of Physicians Against Drug Shortages and immediate past president of the Pennsylvania Society of Anesthesiologists, surging prices have hit hundreds of mainstay generics, including anesthetics, chemotherapeutic agents, antibiotics, and nutritional intravenous solutions. He believes the surging prices are a result of anti-competitive behavior.

"The truth is that drug shortages and price spikes are not terribly complex," says Dr. Campbell, adding that there's growing concern within the medical community. "If you consider one simple fact -

---

[47] Liam Vaughan and Jered S. Hopkins, *Mylan, Teva Led Peers in "Anomalous" Price Moves, Study Says*, BLOOMBERG (Dec. 22, 2016) *available at* https://www.bloomberg.com/news/articles/2016-12-22/widespread-drug-price-increases-point-to-collusion-study-finds

[48] David Belk, MD, *Generic Medication Prices*, TRUE COST OF HEALTH-CARE *available at* http://truecostofhealthcare .net/generic_medication_prices/.

[49] GAO Report to Congressional Requesters, *Generic Drugs Under Medicare* (Aug. 2016), *available at* http://www.gao.gov/assets/680/679055.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

high demand and low supply at high prices - what possible explanations are there for such a condition?"[50]

**E.   Defendants' concerted efforts to increase prices for generic Lidocaine-Prilocaine yielded supracompetitive profits**

137.   Defendants' agreement to inflate the prices of generic Lidocaine-Prilocaine resulted in increased revenues and higher profits.

138.   For example, Impax experienced $596 million in total revenues in the 2014 calendar year, as compared to $511 million in 2013, which is a 17% increase.[51] Akorn's total revenues increased from $233 million during the nine months preceding September 2013 to $374 million during the nine months preceding September 2014, an increase of 61%.[52]

**F.   Factors increasing the market's susceptibility to collusion**

139.   Publicly available data on the generic Lidocaine-Prilocaine market in the United States demonstrate that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

---

[50] Pennsylvania Medical Society, Press Release, *Rising Generic Drug costs Have Physicians Raising Red Flags* (Feb. 5, 2016), *available at* http://www.prnewswire.com/news-releases/rising-generic-drug-costs-have-physicians-raising-red-flags-300216006.html.

[51] Impax SEC Form 10-K (Feb. 13, 2015), *available at* http://d1lge852tjjqow.cloudfront.net/CIK-0001003642/c545ab21-aa3d-4426-a0b9-ba4373b6c213.pdf?noexit=true.

[52] Akorn SEC Form 10-Q (Nov. 7, 2014), *available at* https://www.sec.gov/Archives/edgar/data/3116/000117184314005410/f10q_111014.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 5.    Industry concentration

140.    A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators. Here, Defendants controlled approximately ███ of the generic Lidocaine-Prilocaine market by ████████.

141.    In the United States, generic Lidocaine-Prilocaine cream has an extremely high HHI, as noted above, which makes the market for this product an excellent candidate for collusion.

142.    While the market for Lidocaine-Prilocaine is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

143.    No departures from the market by manufacturers of Lidocaine-Prilocaine can explain the price increases.

144.    The price increases here are extreme – Sandoz ████████ over the course of less than a year, followed closely by the other Defendants. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 6.    Barriers to entry

145.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

146.    There are significant capital, regulatory, and intellectual property barriers to entry in the generic Lidocaine-Prilocaine market that make such entry time-consuming and expensive.

FILED WITH REDACTIONS – PUBLIC VERSION

147.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Lidocaine-Prilocaine markets.

148.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[53] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 7.    Demand inelasticity

149.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

150.    Demand for Defendants' Lidocaine-Prilocaine products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.  Additionally, the incentives of actors in the Lidocaine-Prilocaine market are not sensitive to price, as they are in most other markets.  Doctors who prescribe Lidocaine-Prilocaine have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written.  When Defendants increased their Lidocaine-Prilocaine prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

---

[53] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

151.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue

152.    Thus, generic Lidocaine-Prilocaine is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 8.    Lack of substitutes

153.    There are no reasonable substitutes for Lidocaine-Prilocaine. Lidocaine and prilocaine, the active ingredients in Lidocaine-Prilocaine, are unique compounds that are not therapeutically equivalent to other treatments. Further, when used in combination, lidocaine and prilocaine are similarly unique and lack therapeutic equivalence.

154.    In addition, branded versions of Lidocaine-Prilocaine do not serve as economic substitutes for generic versions of these compounds because branded products generally maintain substantial price premiums over even their supra-competitively priced generic counterparts, making them inapt substitutes even when generic prices soar.

155.    Thus, purchasers of generic Lidocaine-Prilocaine are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

**FILED WITH REDACTIONS – PUBLIC VERSION**

9.      **Standardized product with high degree of interchangeability**

156.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively. Here, the Lidocaine-Prilocaine made by the Defendant manufacturers each contain identical active ingredients, are bioequivalent, and are viewed as interchangeable by the pharmacies that fill the prescriptions.

157.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

158.    Defendants' generic Lidocaine-Prilocaine products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.

159.    Moreover, because generic Lidocaine-Prilocaine products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service. Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through

44

price competition.[54] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 10.   Inter-competitor contacts and communications

160.   As discussed above, Defendants' representatives frequently met at conferences convened by customers and trade associations of customers (such as the ▆▆▆▆ and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[55]

161.   The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

162.   DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications. These types of communications are not unique or isolated, but are rampant;

---

[54] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[55] PaRR Report.

FILED WITH REDACTIONS – PUBLIC VERSION

"[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[56] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

    (a)    **Actavis**: In February 2016, Actavis's predecessor, Allergan plc, disclosed that it received a DOJ subpoena "seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."[57]

    (b)    **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[58] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[59]

    (c)    **Citron**: In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[60]

    (d)    **Dr. Reddy's**: In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking

---

[56] State AG Amended Complaint ¶ 7.

[57] Allergan, SEC 2015 Form 10-K (Feb. 26, 2016), at 27, *available at* https://www.sec.gov/Archives/edgar/data/1578845/000156459016013478/agn-10k_20151231.htm.

[58] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[59] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[60] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[61]

(e)     **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[62] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.[63]

(f)     **Impax**:  In July 2014, Defendant Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[64]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[65]  In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[66]

(g)     **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[67]  On November 3, 2014, Lannett disclosed that a

---

[61] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[62] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[63] *See supra* ¶20.

[64] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[65] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[66] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[67] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

47

Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[68]    On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[69]

(h)    **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[70]    On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[71]

(i)    **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with

---

[68] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[69] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[70] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[71] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

competitors about such products."[72] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[73]

(j)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[74] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[75] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[76]

(k)    **Perrigo**:  On May 2, 2017, Perrigo disclosed that "search warrants were executed at the Company's corporate offices associated with

---

[72] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdo c.htm.

[73] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdo c.htm.

[74] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[75] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[76] *Id.* at 31.

**FILED WITH REDACTIONS – PUBLIC VERSION**

an ongoing investigation by the U.S. Department of Justice Antitrust Division related to drug pricing in the pharmaceutical industry."[77]

(l)   **Sandoz**:  In March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products sold by Sandoz Inc. and its subsidiaries, including Fougera Pharmaceuticals, Inc. (Fougera), and related communications with competitors."[78]

(m)   **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[79]

(n)   **Taro**:  In September 2016, Taro disclosed that the Company "and two senior officers" received DOJ subpoenas seeking documents relating to "generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[80]

(o)   **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva

---

[77] Perrigo Press Release (May 2, 2017), *available at* http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[78] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[79] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[80] Taro, SEC Form 6-K (Sept. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/906338/000115752316006685/a51417528.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

USA's generic products and communications with competitors about such products."[81]

(p)    **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[82]

## IX.    THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    The Statutes of Limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

163.    Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Lidocaine-Prilocaine.  And indeed, Defendants' disclosures regarding the government investigations did not indicate Lidocaine-Prilocaine specifically.

164.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Lidocaine-Prilocaine.

165.    Plaintiffs had no direct contact or interaction with any of the Defendants in this case by which they could have discovered Defendants' conspiracy.

---

[81] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[82] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

**FILED WITH REDACTIONS – PUBLIC VERSION**

166.     Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

(a)     Impax's Code of Conduct provides: "Impax is committed to free and open competition in the marketplace, and requires employees to strictly adhere to the antitrust laws in the countries where we do business…. No employee may discuss with, or provide information to, any competitor about pricing or related matters, whether the information concerns Impax or its suppliers, distributors, wholesalers or customers."[83]

(b)     Novartis's (the parent of Sandoz and Fougera) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[84]

(c)     Akorn's Code of Ethics provides: "Competitors cannot agree on or manipulate the prices they will charge for their products and services. You should never discuss our pricing or pricing practices with a competitor […] It is unlawful and against Akorn policy to collaborate or exchange information with competitors or to restrain competition in any way, such as by dividing customers or markets."[85]

167.     It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

168.     For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

---

[83] Impax Code of Conduct, *available at* http://s1.q4cdn.com/790711406/files/doc_downloads/Code-of-Conduct-2016.pdf.

[84] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[85] file:///C:/Users/scho/Downloads/Code%20of%20Ethics%2002-2016.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

## B.     Fraudulent concealment tolled the Statutes of Limitations

169.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Lidocaine-Prilocaine.

170.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Lidocaine-Prilocaine.

171.    Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Lidocaine-Prilocaine. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of Lidocaine-Prilocaine they purchased. Defendants' statements and conduct concerning the prices of Lidocaine-Prilocaine were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing Lidocaine-Prilocaine at prices established by a free and fair market.

FILED WITH REDACTIONS – PUBLIC VERSION

### 1.     Active concealment of the conspiracy

172.     Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

173.     Defendants' misrepresentations regarding price changes and competition in their industry were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Lidocaine-Prilocaine.

174.     As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[86]

### 2.     Plaintiffs exercised reasonable diligence

175.     Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

---

[86] State AG Amended Complaint ¶ 13.

FILED WITH REDACTIONS – PUBLIC VERSION

176.     Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

177.     Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

178.     For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## X.     CONTINUING VIOLATIONS

179.     This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.     DEFENDANTS' ANTITRUST VIOLATIONS

180.     During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Lidocaine-Prilocaine sold in the United States.

181.     In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain,

and/or stabilize the price of generic Lidocaine-Prilocaine sold in the United States. These activities included the following:

    (a)    Defendants participated in meetings and/or conversations regarding the price of generic Lidocaine-Prilocaine in the United States;

    (b)    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of generic Lidocaine-Prilocaine sold in the United States;

    (c)    Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of generic Lidocaine-Prilocaine; and

    (d)    Defendants issued price announcements and price quotations in accordance with their agreements.

182. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

183. During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Lidocaine-Prilocaine at inflated and supracompetitive prices.

184. Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

185. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Lidocaine-Prilocaine than they would have paid in a competitive market.

186. General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at

FILED WITH REDACTIONS – PUBLIC VERSION

the higher level of distribution are passed on to independent pharmacists, who cannot negotiate their acquisition costs. Wholesalers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Lidocaine-Prilocaine.

187. The unlawful contract, combination and conspiracy has had the following effects, among others:

> (a)   price competition in the market for generic Lidocaine-Prilocaine has been artificially restrained;
>
> (b)   prices for generic Lidocaine-Prilocaine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and
>
> (c)   purchasers of generic Lidocaine-Prilocaine sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Lidocaine-Prilocaine.

## XII.   CLASS ACTION ALLEGATIONS

188. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that purchased Defendants' generic Lidocaine-Prilocaine products from March 1, 2014 through the present.
>
> This class excludes:   (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

189. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

FILED WITH REDACTIONS – PUBLIC VERSION

common law of unjust enrichment and the state antitrust, unfair competition, and consumer

protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[87]

on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Lidocaine-Prilocaine products from March 1, 2014 through the present.[88]

> This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

190.   The Nationwide Class and the Damages Class are referred to herein as the

"Classes."

191.   While Plaintiffs do not know the exact number of the members of the Classes,

rosters of members of national independent pharmacy organizations indicate that there are at least

20,000 members in each class.

192.   Common questions of law and fact exist as to all members of the Classes. This is

particularly true given the nature of Defendants' conspiracy, which was generally applicable to all

the members of both Classes, thereby making appropriate relief with respect to the Classes as a

whole. Such questions of law and fact common to the Classes include, but are not limited to:

---

[87] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, <u>Connecticut,</u> Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

[88] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ [196].

FILED WITH REDACTIONS – PUBLIC VERSION

(a)     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Lidocaine-Prilocaine and/or engaged in market allocation for generic Lidocaine-Prilocaine sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Lidocaine-Prilocaine sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Lidocaine-Prilocaine, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

193.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Defendants' Lidocaine-Prilocaine products. Plaintiffs' claims

FILED WITH REDACTIONS – PUBLIC VERSION

arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

194.   Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

195.   The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

196.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

**FILED WITH REDACTIONS – PUBLIC VERSION**

197.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIII.     CAUSE OF ACTIONS

### FIRST COUNT

**Violation of Sections 1 and 3 of the Sherman Act
(on behalf of Plaintiffs and the Nationwide Class)**

198.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

199.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

200.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Lidocaine-Prilocaine, thereby creating anticompetitive effects.

201.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Lidocaine-Prilocaine.

202.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Lidocaine-Prilocaine have been harmed by being forced to pay inflated, supracompetitive prices for generic Lidocaine-Prilocaine.

FILED WITH REDACTIONS – PUBLIC VERSION

203.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

204.     Defendants' conspiracy had the following effects, among others:

(a)  Price competition in the market for generic Lidocaine-Prilocaine has been restrained, suppressed, and/or eliminated in the United States;

(b)  Prices for generic Lidocaine-Prilocaine provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)  Plaintiffs and members of the Nationwide Class who purchased Defendants' (and their co-conspirators') Lidocaine-Prilocaine products have been deprived of the benefits of free and open competition.

205.     Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Defendants and their co-conspirators' generic Lidocaine-Prilocaine products than they would have paid and will pay in the absence of the conspiracy.

206.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

207.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## SECOND COUNT

### Violation of State Antitrust Statutes[89]
### (on behalf of Plaintiffs and the Damages Class)

208.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

209.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Lidocaine-Prilocaine in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

210.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Lidocaine-Prilocaine and to allocate customers for generic Lidocaine-Prilocaine in the United States.

211.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Lidocaine-Prilocaine at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Lidocaine-Prilocaine provided in the United States; and

(b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

---

[89] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

212.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Lidocaine-Prilocaine. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

213.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

214.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

215.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

216.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Lidocaine-Prilocaine was restrained, suppressed, and eliminated throughout Alabama; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

217.   **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and conspiracy had the following effects: (1) price competition for generic Lidocaine-Prilocaine was restrained, suppressed, and eliminated throughout Arizona; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

218.   **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Lidocaine-Prilocaine at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Lidocaine-Prilocaine. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts,

65

practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Lidocaine-Prilocaine. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic Lidocaine-Prilocaine has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Lidocaine-Prilocaine provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Lidocaine-Prilocaine indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Lidocaine-Prilocaine than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

219.    **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Lidocaine-Prilocaine in the District of Columbia that were shipped by Defendants or their co-

FILED WITH REDACTIONS – PUBLIC VERSION

conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Lidocaine-Prilocaine in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Lidocaine-Prilocaine, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

220.   **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine Prilocaine price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened

FILED WITH REDACTIONS – PUBLIC VERSION

~~with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.~~[90]

221.   **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

222.   **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Lidocaine-Prilocaine, increasing the prices of generic Lidocaine-Prilocaine, preventing competition in the sale of generic Lidocaine-Prilocaine, or binding themselves not to sell generic Lidocaine-Prilocaine, in a manner that established the price of generic Lidocaine-Prilocaine and precluded free and unrestricted competition among themselves in the sale of generic Lidocaine-Prilocaine, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Lidocaine-Prilocaine prices were raised, fixed,

---

[90] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

223.   **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

224.   **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

69

in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

225.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

226.   **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class

70

Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

227.    **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

228.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct

71

and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

229.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

230.    **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico

FILED WITH REDACTIONS – PUBLIC VERSION

commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

231.    **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

232.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Lidocaine-

73

Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

233.  **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

234.  **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained,

FILED WITH REDACTIONS – PUBLIC VERSION

suppressed, and eliminated throughout Oregon; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

235.     **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

236.     **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was

75

restrained, suppressed, and eliminated throughout South Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

237. **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

238. **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy

FILED WITH REDACTIONS – PUBLIC VERSION

had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

239. **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

240. **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West

**FILED WITH REDACTIONS – PUBLIC VERSION**

Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

241.   **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq.

FILED WITH REDACTIONS – PUBLIC VERSION

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

241a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

241b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Lidocaine-Prilocaine and raised, fixed, maintained, and stabilized generic Lidocaine-Prilocaine prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

242.    **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Lidocaine-Prilocaine than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

243.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

244.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[91]
### (on behalf of Plaintiffs and the Damages Class)

245.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[91] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia,~~ ~~Michigan,~~ Minnesota, Nebraska, ~~Nevada,~~ New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina,~~ South Dakota, ~~West Virginia,~~ Wisconsin and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

246.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

247.    **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq*.  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

248.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Arkansas and took

efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants Sandoz and Akorn increased prices of Lidocaine-Prilocaine, a medical supply, by 10% or more during the 30 days following a declaration of a state of emergency in Arkansas, in violation of A.C.A. § 4-88-303 *et seq.*[92] The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

249. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*. During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Lidocaine-Prilocaine in California, and committed and continue to

---

[92] States of emergency for Arkansas were declared on at least January 3, 2013; January 17, 2014; March 3, 2014; April 28, 2014; and February 18, 2015; September 8, 2015 February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; and August 16, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

commit acts of unfair competition, as defined by § 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq*., including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq*. of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq*. of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Lidocaine-Prilocaine in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Moreover, Defendants Akorn and Hi-Tech unlawfully raised prices of Lidocaine-Prilocaine, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396,

thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.[93] Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Lidocaine-Prilocaine. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants

---

[93] States of Emergency for California were declared on at least August 22, 2012; July 12, 2013; August 9, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 22, 2015; July 31, 2015; September 11, 2015; September 13, 2015; and December 18, 2015.

84

as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

250.   **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

251.   **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the

Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

252.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair

86

competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

253.   **Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine Prilocaine were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine Prilocaine price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Lidocaine Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine Prilocaine, likely misled all purchasers acting

87

reasonably under the circumstances to believe that they were purchasing generic Lidocaine Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[94]

254.   **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine Prilocaine were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine Prilocaine price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Lidocaine Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of

---

[94] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

~~unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

255. **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

256. **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection

FILED WITH REDACTIONS – PUBLIC VERSION

Act, Neb. Rev. Stat. § 59-1601, *et seq.*  Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

257. **Nevada:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine Prilocaine were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine Prilocaine price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Lidocaine Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and~~

members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

258.    **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

259.    **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act,

N.J. Statutes § 56:8-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants Sandoz and Fougera raised prices of Lidocaine Prilocaine, which is "used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% within 30 days of the termination of a state of emergency in New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq.*[95] Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely

---

[95] States of emergency for New Jersey were declared on at least October 27, 2012; October 28, 2012; January 2, 2013; January 21, 2014; November 26, 2014; December 23, 2014; January 26, 2015; March 4, 2015; January 22, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Lidocaine-Prilocaine as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Lidocaine-Prilocaine because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Lidocaine-Prilocaine, including their illegal conspiracy to secretly

fix the price of generic Lidocaine-Prilocaine at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Lidocaine-Prilocaine. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

261.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Lidocaine-Prilocaine that either

omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Lidocaine-Prilocaine; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Lidocaine-Prilocaine were misled to believe that they were paying a fair price for generic Lidocaine-Prilocaine or the price increases for generic Lidocaine-Prilocaine were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Lidocaine-Prilocaine would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Lidocaine-Prilocaine would have a broad impact, causing consumer class members who indirectly purchased generic Lidocaine-Prilocaine to be injured by paying more for generic Lidocaine-Prilocaine than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During

FILED WITH REDACTIONS – PUBLIC VERSION

the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Lidocaine-Prilocaine in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

262. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Lidocaine-Prilocaine created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants Sandoz and Akorn charged "unreasonably excessive" prices for Lidocaine-Prilocaine, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North

Carolina. Gen..Stat. § 75-38 and § 75-1.1.[96] The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Lidocaine-Prilocaine in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Lidocaine-Prilocaine in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

263.  **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or

---

[96] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16, 2015; February 25, 2015; and October 1, 2015; January 20, 2016; February 17, 2016.

FILED WITH REDACTIONS – PUBLIC VERSION

Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

FILED WITH REDACTIONS – PUBLIC VERSION

264.   ~~**South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Lidocaine Prilocaine price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Lidocaine Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.~~[97]

265.   **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants misrepresented to all purchasers during the Class Period that Defendants'

---

[97] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

266.   **West Virginia:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic~~

Lidocaine Prilocaine were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine Prilocaine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine Prilocaine price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Lidocaine Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and,

FILED WITH REDACTIONS – PUBLIC VERSION

~~accordingly, Plaintiffs and members of the Damages Class seek all relief available under that~~ ~~statute.~~[98]

267.    **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants'

---

[98] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

268.    **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Lidocaine-Prilocaine were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Lidocaine-Prilocaine. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Lidocaine-Prilocaine prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Lidocaine-Prilocaine price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Lidocaine-Prilocaine prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and

**FILED WITH REDACTIONS – PUBLIC VERSION**

deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Lidocaine-Prilocaine, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Lidocaine-Prilocaine at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Lidocaine-Prilocaine they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[99]
### (on behalf of Plaintiffs and the Damages Class)

269.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

270.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

---

[99] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

271.    Defendants have unlawfully benefited from their sales of generic Lidocaine-Prilocaine because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Lidocaine-Prilocaine at prices that were more than they would have been but for Defendants' unlawful actions.

272.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

273.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

274.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Lidocaine-Prilocaine while Plaintiffs have been impoverished by the overcharges they paid for generic Lidocaine-Prilocaine imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

275.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

276.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

277.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Lidocaine-Prilocaine.

FILED WITH REDACTIONS – PUBLIC VERSION

278.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Lidocaine-Prilocaine are ascertainable by review of sales records.

279.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Lidocaine-Prilocaine.

280.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Lidocaine-Prilocaine, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

281.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Lidocaine-Prilocaine is a direct and proximate result of Defendants' unlawful practices.

282.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

283.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Lidocaine-Prilocaine derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

FILED WITH REDACTIONS – PUBLIC VERSION

284.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Lidocaine-Prilocaine prices remain inflated above pre-conspiracy levels.

285.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Lidocaine-Prilocaine.

286.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to purchases of generic Lidocaine-Prilocaine by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

**FILED WITH REDACTIONS – PUBLIC VERSION**

C.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

FILED WITH REDACTIONS – PUBLIC VERSION

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XV.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 1, 2019                                       Respectfully submitted,

<u>/s/  Jonathan W. Cuneo</u>

Peter Gil-Montllor                         Jonathan W. Cuneo
Christian Hudson                          Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**           Daniel Cohen
16 Court Street, Suite 1012               Victoria Romanenko
Brooklyn, NY 11241                        Blaine Finley
202-789-3960                              **CUNEO, GILBERT & LADUCA LLP**
<u>pgil-montllor@cuneolaw.com</u>          4725 Wisconsin Ave., NW Suite 200
                                          Washington, DC 20016
                                          202-789-3960
                                          <u>jonc@cuneolaw.com</u>

                                          *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**